## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-CV-81305-RAR

**MATTHEW JOHN LEWIS**,

  Plaintiff,

v.

**RONALD WAITTS**, *et al.*,

  Defendants.

_____/

### ORDER

  **THIS CAUSE** comes before the Court on Plaintiff Matthew John Lewis's *pro se* Complaint for Violation of Civil Rights brought under 42 U.S.C. § 1983, [ECF No. 1]. Plaintiff, a pretrial detainee, pursues various claims under the United States Constitution and federal law against ten Defendants employed by the Palm Beach County Sheriff's Office ("PBSO"). *See generally* Compl. Plaintiff's allegations arise from his medical use of suboxone to treat his drug addiction, and Plaintiff predominantly alleges that Defendants discriminated against him on the basis of his disability, denied him medical care, violated his right to privacy, and retaliated against Plaintiff's use of his facility's grievance system. *See generally id.* After careful review, the Complaint shall **PROCEED in part** and be **DISMISSED in part**.

### LEGAL STANDARDS

#### A. General Principles

  The Court "*shall* review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A (emphasis added). The definition of a "prisoner" includes "any person incarcerated or detained in any facility who is . . . accused of [or] convicted of . . . violations of criminal law." *Id.* §

1915A(c).  In conducting its screening of a prisoner's complaint, the Court must "dismiss the complaint[] or any portion of the complaint," when it is (1) "frivolous, malicious, or fails to state a claim upon which relief may be granted[;]" or (2) "seeks monetary relief from a defendant who is immune from such relief."  *Id.* § 1915A(b).  Similarly, if a plaintiff wishes to proceed *in forma pauperis* rather than prepaying the filing fee, § 1915(e)(2) requires the court to "dismiss [a] case *at any time* if the court determines that . . . the action" fails for the same enumerated reasons articulated under § 1915A.  *Id.* § 1915(e)(2)(B) (emphasis added).

To state a claim upon which relief may be granted, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level"—with "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Under this standard, legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Moreover, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (internal quotation marks omitted).

Although the Court must hold the allegations in a *pro se* civil rights complaint "to a less stringent standard than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), *pro se* litigants are still required to comply with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Florida, *see Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) ("[A *pro se* litigant] is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."); *see also* S.D. FLA. L.R. 1.1 (explaining the Local Rules apply in all proceedings unless otherwise indicated and that the word "counsel" shall apply to a party that is proceeding *pro se*).  The Federal Rules of Civil Procedure require, in pertinent part, that a pleading that states a claim for relief contain "a short and plain statement of the grounds for a

court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought[.]"  FED. R. CIV. P. 8(a).  "A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances[,]" and "each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense."  *Id.* 10(b).

### B.  Municipality and Supervisory Claims

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]"  *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 n.55 (1978).  "Such suits against municipal officers are therefore, in actuality, suits directly against the [municipality] that the officer represents."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citing cases).

"A municipality may be held liable under [42 U.S.C.] § 1983 if the plaintiff shows that a 'custom' or 'policy' of the municipality was the 'moving force' behind the constitutional deprivation."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (quoting *Monell*, 436 U.S. at 690–94).  "A plaintiff . . . has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county."  *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329–30 (11th Cir. 2003).

Similarly, a sheriff's supervisory liability under § 1983 can occur in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so[,]" (2) the supervisor has a "custom or policy" which "results in deliberate indifference to [the plaintiff's] constitutional rights," or (3) the supervisor failed "to adequately train [his] officers"—which is a *de facto* policy that "giv[es] rise to governmental liability."  *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022)

(cleaned up).  A sheriff is *not* liable for the unconstitutional acts of his or her subordinates on the basis of *respondeat superior* or vicarious liability.  *See Cottone v. Jenne*, 326 F.3d 1352, 1362 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

Ultimately, "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."  *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

## ANALYSIS

Although Plaintiff purports to raise eight separate claims against ten Defendants, the Court construes the Complaint as presenting *seven* claims, which include one right-to-privacy claim, one claim under federal discrimination law, one speech retaliation claim, and four claims of cruel and unusual punishment.  After carefully reviewing the allegations, the Court will allow Plaintiff's First Amendment retaliation claims against both Defendants Deputy Ramerez and Nurse Loraine Skinner, as well as Plaintiff's deliberate indifference claim against Defendant Dr. Ronald Waitts, to proceed to service.  All of Plaintiff's other claims are dismissed for failure to state a claim. The Court addresses each claim below.

### A.  Fourteenth Amendment Right to Privacy

Plaintiff claims that PBSO deputies violated his right to privacy under the Fourteenth Amendment by disclosing his sensitive medical information to other inmates, namely, that Plaintiff is prescribed suboxone, *see* Compl. at 3, 9—a medication used to treat opioid dependence. Plaintiff says that "each deputy would expose the medication name" and some would add "discriminat[ing] remarks."  *Id.*  Plaintiff also alleges that Wellpath medical staff would "allow other . . . inmates to observe" his suboxone administration.  *Id.* at 10.

The scope of one's right to privacy over his personal medical information is "far from settled" in the Eleventh Circuit. *Harris v. Thigpen*, 941 F.2d 1495, 1515 (11th Cir. 1991); *see also Hanney v. Garcia*, No. 13-CV-2928, 2015 WL 1277991, at \*5 (M.D. Fla. Mar. 20, 2015).

The Fourteenth Amendment's Due Process Clause provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause covers certain fundamental rights not mentioned in the United States Constitution but otherwise "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

There is no express right to privacy in the U.S. Constitution. *See Paul v. Davis*, 424 U.S. 693, 712 (1976); *see also Dobbs*, 142 S. Ct. at 2257 ("The [*Roe*] Court did not claim that this broadly framed right [to privacy] is absolute, and no such claim would be plausible." (cleaned up)). However, the Supreme Court *has* recognized a fundamental right to privacy "in the nondisclosure of [one's] private information[.]" *Whalen v. Roe*, 429 U.S. 589, 600 (1977). The Supreme Court has nevertheless expressed "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citation omitted).

The Supreme Court's decision in *Whalen* has encouraged the Second, Third, and Seventh Circuits to recognize a fundamental right to privacy in one's personal medical information. *See, e.g.*, *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) (relying on *Whalen* to hold that "[i]ndividuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition"); *Doe v. Delie*, 257 F.3d 309, 323 (3d Cir. 2001) (relying on *Whalen* and holding that prison inmates possess a substantive due process right to privacy in their medical information); *Schaill ex rel. Kross v. Tippecanoe Co. Sch. Corp.*, 864 F.2d 1309, 1322 n.19 (7th

Cir. 1988) (relying on *Whalen* while "recogniz[ing] that . . . students have a substantial privacy interest in the confidentiality of medical information"). The Sixth Circuit holds the opposite view. *See, e.g.*, *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995) (holding disclosure of medical records does not violate constitutional right to privacy).

The Eleventh Circuit finds itself in the middle of this spectrum. *See Harris*, 941 F.2d at 1513–15. In *Harris*, the Eleventh Circuit addressed the non-consensual disclosure of a prisoner's HIV-positive diagnosis. *See id.* at 1513. While noting that "[t]he precise nature and scope of the privacy right at issue . . . is rather ill-defined[,]" the Court stated, "[w]e nevertheless believe and assume *arguendo* that seropositive prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other[s]." *Id.* (cleaned up). The *Harris* Court went on to note that "some authority" supports a right to privacy "in preventing the non-consensual disclosure of one's medical condition or diagnosis." *Id.* n.26. Importantly, each of the Court's listed authorities concerned the disclosure of inmates' seropositive AIDS or HIV status, *see id.*, including two district court cases from which the Eleventh Circuit primarily drew support, *see id.* at 1514, 1514 n.27; *see Doe v. Coughlin*, 697 F. Supp. 1234, 1237–38 (N.D.N.Y. 1988) ("Each [seropositive prisoner] is fully aware that he is infected with a disease which at the present time has inevitably proven fatal. In the court's view[,] there are few matters of a more personal nature . . . The threat to family life and the emotional enrichment [gained] from close ties with others . . . is quite real when an AIDS victim's diagnosis is revealed." (cleaned up)); *Doe v. Borough of Barrington*, 729 F. Supp. 376, 384 (D.N.J. 1990) ("Society's moral judgments about the high-risk activities associated with [AIDS], including sexual relations and drug use, make the information of the most personal kind. Also, the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease.").

The *Harris* Court concluded that "[t]he scope of such a right, however, is far from settled, and we need not divine its precise parameters here, given our holding *infra* that any such right is outweighed by the legitimate penological interests of the Alabama DOC." *Harris*, 941 F.2d at 1513 n.26. This is not the first time the Eleventh Circuit "has declined to define the precise parameters of a prisoner's constitutional right to privacy[.]" *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). In *Fortner*, the Eleventh Circuit emphasized that it approaches such questions "on a case-by-case basis," *id.*, and recognized a prisoner's fundamental right to bodily privacy "because most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'"[1] *Id.* (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)).

With the foregoing history in mind, the Court turns to the question at bar, an issue of first impression: whether a detainee retains a right to privacy in the non-consensual disclosure of his suboxone prescription. The Court is bound by this Circuit's case-by-case approach; reviewing Plaintiff's facts, the Court recognizes that the disclosure of his suboxone prescription inherently reveals his struggles with addiction—a mental illness that is undeniably a "personal matter" susceptible to humiliation. *Whalen*, 429 U.S. at 599. Whether such disclosure rises to one of a *constitutional* magnitude is less certain. Revealing substance abuse and treatment thereof (particularly in prison) may not trigger the specific implications observed by this Circuit in *Harris* and *Fortner*—namely, those stemming from strong liberty interests in sexual intimacy and nudity, as well as the incomparable stigmatization of AIDS or HIV. The Court is also guided by this

---

[1] Though not concerning *informational* privacy, the Eleventh Circuit's justifications in *Fortner* are not too far off from those explored in *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998). There, the Sixth Circuit explained that when a sheriff publicly revealed the "highly personal and extremely humiliating details" of a woman's rape, *id.* at 676, the state invoked her right to privacy because "sexuality and choices about sex . . . are interests of an intimate nature which define significant portions of our personhood," *id.* at 685. Nevertheless, the Sixth Circuit has shown even greater restraint in finding informational privacy interests of constitutional dimension. *See, e.g.*, *Lambert v. Hartman*, 517 F.3d 433, 445–46 (6th Cir. 2008).

Circuit's clear hesitation to impose a bright-line rule that nondisclosure of *all* medical conditions or records are covered by the Fourteenth Amendment;[2] therefore, this distinction alone is enough for the Court to decline expanding the already-limited right to privacy. *See Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1304–05 (11th Cir. 2003) ("We must take seriously the Supreme Court's caution against expanding the concept of substantive due process.").

Because Plaintiff fails to state a claim upon which relief can be granted, Plaintiff's right-to-privacy claim is **DISMISSED** *with prejudice*.

### B.  Americans with Disabilities Act

Plaintiff claims Defendants violated Title II of the Americans with Disabilities Act ("ADA") by discriminating against him for his medical condition.  For instance, Plaintiff says Defendant Nurse Skinner degraded him for his need for suboxone, at one point calling Plaintiff, "nothing but a junkie" and a "crackhead."  Compl. at 15.  At other times, PBSO staff would ridicule Plaintiff for his suboxone use.  *See id.* at 15–16.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute creates a private cause of action for monetary damages against a public entity that discriminates against a qualified individual.  *See id.* § 12133; *see also United States v. Georgia*, 546 U.S. 151, 154 (2006). However, individuals and private entities are not liable under Title II of the ADA.  *See Edison v. Douberly*, 604 F.3d 1307, 1308 (11th Cir. 2010).

---

[2]  The Court notes another court in this District has held that "[t]he constitutional right to privacy extends to the individual interest in avoiding the disclosure of personal matters, and medical or psychiatric records fall within that sphere."  *Nat'l Transp. Safety v. Hollywood Mem.*, 735 F. Supp. 423, 424 (S.D. Fla. 1990) (citations omitted).  But this case was decided before the Eleventh Circuit announced *Harris* one year later; thus, the Court finds it unpersuasive.

To state a claim under Title II, a plaintiff must allege the following three elements: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023) (cleaned up; quoting *J.S., III ex rel. J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017)).  An ADA plaintiff seeking damages must also allege that the entity was deliberately indifferent by "'engag[ing] in intentional discrimination,'" which requires a showing "that the [entity] had 'actual knowledge of discrimination in the entity's programs' and failed to adequately respond." *Id.* (cleaned up; quoting *Ingram v. Kubik*, 30 F.4th 1241, 1250, 1257 (11th Cir. 2022)).

First, since each of the named individual Defendants and Wellpath Medical are not public entities, they are not subject to suit under Title II. *See Brennan v. Thomas*, 780 F. App'x 813, 823 (11th Cir. 2019).  Second, assuming Plaintiff could bring his ADA claim against PBSO, he must allege intentional discrimination since he seeks monetary damages. *See* Compl. at 9 (requesting $500,000 in actual damages and $10,000 in punitive damages).  Plaintiff's averments of discrimination arise only from repeated verbal comments from staff members; however, Plaintiff fails to address whether PBSO had any actual knowledge of its employees' discriminatory comments or how PBSO failed to respond to them—and he cannot simply impute such knowledge merely through factually unsupported grievances he may have filed. *See, e.g.*, *id.* at 10.  Without more, Plaintiff's ADA claim against PBSO cannot proceed.[3]

---

[3] For that matter, all of Plaintiff's factually unsupported and conclusory allegations of knowledge pertaining to all Defendants, *see* Compl. at 6–8, will not satisfy the pleading standards of the Federal Rules of Civil Procedure. *See S. Florida Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996) ("[C]onclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to

Accordingly, because Plaintiff fails to state a claim upon which relief can be granted, his ADA claim is **DISMISSED** *without prejudice*.

### C. First Amendment

Moving on, Plaintiff alleges Defendants Deputy Ramerez, Wellpath Medical, and Nurse Loraine Skinner violated his First Amendment rights by retaliating against Plaintiff's use of the grievance system.[4]  *See* Compl. at 16.  He claims Defendant Ramerez retaliated against Plaintiff by destroying Plaintiff's property, *see id.*, and telling "specific gang members [Plaintiff] was in possession of illicit contraband suboxone and that [Plaintiff] was a snitch who was telling on inmates and deputies[,]" *id.* at 13.  Plaintiff says that "this started a whole new level of hostility and torment" where Plaintiff was "slapped, choked, punched, and held at knife point by several gang members many different times." *Id.*  He also claims Ramerez "planted a shank on his inmate bunk during a routine linen search," after which Plaintiff was placed in solitary confinement with an abusive inmate. *Id.* at 16.  Plaintiff further claims that "Wellpath Medical . . . went out of their way to instigate harassment," describing how Skinner threatened others would harm Plaintiff, saying how she "ha[d] admirers in [Plaintiff's] dorm who would love to beat [him] for her" and that gang members would beat Plaintiff upon her direction. *Id.* at 11 (cleaned up).

---

dismiss."). Mere legal or conclusory recitations will also fail to establish supervisory or municipal liability. *See generally Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003); *see, e.g.*, *Hendrix v. Tucker*, 553 F. App'x 803 (11th Cir. 2013).

[4]  Plaintiff names other individuals and groups responsible for retaliation as well.  *See, e.g.*, Compl. at 10 ("[M]any deputies retaliated on me[.]"); *id.* at 17 ("I was also retaliated on for my writing grievances by Wellpath Nurse Martin."). The Court will not construe a claim against an individual that Plaintiff has not named as a defendant.  Nor will the Court assume Plaintiff pleads a claim against a named Defendant who is otherwise entirely unmentioned in his allegations relevant to that claim.  *See Iqbal*, 556 U.S. at 677 ("Each Government official . . . is only liable for his or her own misconduct.").  Here, Nurse Martin is not a defendant, and Plaintiff's reference to "many deputies" is insufficient for the Court to infer a claim against any other deputy aside from Deputy Ramerez.

"An inmate raises a First Amendment claim of retaliation if he shows that a prison official disciplined him for filing a grievance or lawsuit concerning the conditions of his imprisonment." *Logan v. Hall*, 604 F. App'x 838, 840 (11th Cir. 2015). To state a plausible retaliation claim, Plaintiff must meet three elements: (1) he engaged in constitutionally protected speech or conduct, (2) the defendant's retaliatory actions adversely affected him such that the defendant's alleged conduct "would likely deter a person of ordinary firmness from engaging in such speech," and (3) a causal relationship exists between the defendant's retaliatory conduct and his protected speech. *Hoever v. Hampton*, No. 14-cv-273, 2016 WL 3647596, at *3–4 (N.D. Fla. May 19, 2016), *report and recommendation adopted*, 2016 WL 3647151 (N.D. Fla. June 28, 2016); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

Plaintiff has stated a claim of retaliation against Defendants Ramerez and Skinner.  The law is well-established that the First Amendment protects detainees like Plaintiff from retaliation by prison officials for filing administrative grievances.  *See Green v. Mowery*, 212 F. App'x 918, 919 (11th Cir. 2006).  Plaintiff was adversely and directly affected by Ramerez and Skinner's various threats.  *See* Compl. at 14 ("I was also two more times physically beaten that were never reported from fear of serious threat of harm[.]"); *see also Pittman v. Tucker*, 213 F. App'x 867, 871 (11th Cir. 2007) ("[A] threat of possible violence [] could deter a person of ordinary firmness from filing additional grievances.").  And Plaintiff satisfies the causal connection requirement, as Ramerez and Skinner's vocalizations of their disdain for Plaintiff's complaints were obvious grounds for their actions.  *See Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).  ("The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because [Plaintiff] complained of some of the conditions of his confinement." (citation omitted)).

But Plaintiff does not state a claim against Wellpath Medical, his facility's healthcare provider.  *See Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997) ("[T]he *Monell* policy or

custom requirement applies to suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates."). Plaintiff never attempts to allege that Wellpath had a relevant custom or policy, or that such custom or policy caused these alleged First Amendment violations. *See generally* Compl. Plaintiff may have mentioned Wellpath for the mere fact that it employs Skinner; however, as the Court has explained, Wellpath's liability cannot be based on "a theory of *respondeat superior* or vicarious liability alone." *Est. of Hand by & through Hand v. Fla. Dep't of Corr.*, No. 21-11542, 2023 WL 119426, at *6 (11th Cir. Jan. 6, 2023) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Accordingly, Plaintiff's First Amendment claim against Wellpath Medical is **DISMISSED** *without prejudice*. Plaintiff's retaliation claim against Defendants Deputy Ramerez and Nurse Loraine Skinner shall **PROCEED** to service.

### D. Cruel and Unusual Punishment

As previously described, the Court interprets Plaintiff's allegations as raising *four* separate claims of cruel and unusual punishment. Plaintiff accuses several Defendants of the following: (1) a campaign of harassment against him; (2) denying him medication to treat COVID-19 and maintaining unhealthy conditions; (3) refusing to treat his withdrawal symptoms; and (4) verbally harassing him, retaliating against him, and exposing his medical information to inmates who physically abused him. Since Plaintiff is a pretrial detainee, his claims arise under the Fourteenth Amendment. *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000) (stating that a pretrial detainee's "Cruel and Unusual Punishment claims sound properly in the Fourteenth Amendment right to due process of law rather than in the Eighth Amendment," both of which are analyzed identically).

### 1. Plaintiff's "Campaign of Harassment" Claim

Plaintiff claims that Defendants' actions constitute a collective "campaign of harassment," reincorporating by reference his previous allegations of "retaliations, . . . harassments and humiliations" related to his grievances and suboxone use. Compl. at 17. However, Plaintiff does not identify the legal basis under which he brings this claim. *See id.* The Court will infer Plaintiff's chosen vehicle is the Cruel and Unusual Punishments Clause. *See id.* at 22 ("[E]verything I have previously said should fall under [the Cruel and Unusual Punishments Clause]." (cleaned up)).

Even so, Plaintiff's bare-bones suggestion of a "campaign of harassment" falls significantly short of the pleading standards governing any legal theory. For one thing, Plaintiff doesn't state a single Defendant responsible for a "campaign of harassment," and the Court will not speculate whom Plaintiff had in mind. And if Plaintiff is suggesting a conspiracy under 42 U.S.C. § 1983, he makes no effort to articulate how "the defendants reached an understanding to violate his rights." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002). Moreover, Plaintiff's vague references to retaliations and harassments are duplicative of Plaintiff's claims of retaliation, right to privacy, discrimination, and other unlawful inflictions of punishment. Since the Court declines to recognize this conclusory allegation as separate from Plaintiff's other claims, this claim is **DISMISSED** *without prejudice*.

### 2. Claims against Dr. Brucelle, Dr. Ronald Waitts, PBSO, and Wellpath Medical

Next, the Court infers two separate deliberate-indifference claims against Defendants PBSO, Wellpath Medical, Dr. Brucelle, and Dr. Ronald Waitts, arising from facility conditions that led Plaintiff to contract COVID-19 at various times, as well as these Defendants' alleged failure to treat Plaintiff's COVID-19 or his withdrawal symptoms.[5] *See* Compl. at 17–22.

---

[5] Plaintiff states in a separate portion of the Complaint that "Deputies like Muntean or Love would make comments about delaying my medication if I did anything they personally disliked . . . [they implied] I

In the Eleventh Circuit, a plaintiff asserting an Eighth Amendment claim of deliberate indifference must satisfy two prongs. First, the plaintiff must show that "the deprivation he allegedly suffered was 'objectively, sufficiently serious,'" which requires him to establish an "objectively serious medical need." *Wade v. McDade*, 106 F.4th 1251, 1255–56 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994)). Second, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," which means that "the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff[.]" *Id.* at 1262. But, a defendant "cannot be found liable . . . if he responded reasonably to the risk." *Id.* (cleaned up). A prisoner's complaint must plausibly allege both prongs to "survive screening under [28 U.S.C. § 1915A]." *Ellard v. Middlebrooks*, No. 22-cv-241, 2023 WL 4686022, at *2 (N.D. Fla. June 26, 2023), *report and recommendation adopted*, 2023 WL 4684911 (N.D. Fla. July 21, 2023).

### a.  COVID-19

Plaintiff claims PBSO "purposely put [him] into contaminated dorms of COVID-19[.]" Compl. at 18.  After everyone in his dorm caught COVID-19, Plaintiff sought Tylenol from a Wellpath nurse, but was denied because he "had not seen the doctor," which he says was "impossible." *Id.*  Plaintiff states he caught COVID-19 a second time "due directly to PBSO['s] deliberate indifference when the adjoining dorm . . . was infected" with the virus. *Id.*  He was again denied pain medication because he had not seen a doctor.  *See id.*

---

refused medication that I'm physically dependent on for not being fast enough on using the toilet.  Making me wait hours and hours forcing me into withdrawals." Compl. at 16.  In this excerpt, it is unclear whether Plaintiff's withdrawal symptoms were caused in part by Defendant Deputy Muntean's actions or some hypothetical construction of Muntean's comments.  In any event, these statements are too vague for the Court to infer a deliberate indifference action against Muntean.

The Court need not analyze whether Plaintiff meets *Monell*'s requirements to sue PBSO and Wellpath because he did not suffer a constitutional deprivation under these circumstances. *See Foulke v. Weller*, No. 22-13942, 2024 WL 2761778, at *8 (11th Cir. May 29, 2024) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." (cleaned up; quoting *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017)); *cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis omitted)).

As an initial matter, while COVID-19 has significantly impacted the globe, its symptoms are widely varied. Plaintiff makes no effort to describe how his COVID-19 symptoms constituted an objectively serious medical need for constitutional purposes; in fact, he doesn't describe his symptoms at all, and the Court will not speculate. Even if his condition was objectively serious, he fails to show how *any* PBSO or Wellpath staff member acted with criminal subjective recklessness. *See Wade*, 106 F.4th at 1262. Plaintiff concedes that nurses deprived him of Tylenol *not* out of sheer refusal, but because Plaintiff needed to see a doctor first, and his claim that visiting a doctor was "impossible" lacks any factual support. Compl. at 18. Plaintiff falls short of demonstrating how any staff member was "actually, subjectively aware that his own conduct caused a substantial risk of serious harm" to him. *Id.* Because Plaintiff cannot state a plausible claim of deliberate indifference here, this claim is **DISMISSED** *without prejudice*.[6]

---

[6] Nor does Plaintiff sufficiently allege that PBSO was deliberately indifferent to his health and safety in failing to prevent the spread of COVID-19, despite implementing quarantine measures. *See* Compl. at 18; *see, e.g.*, *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) (holding facility was not deliberately indifferent in preventing spread of COVID-19 where social distancing was impossible to achieve considering the population at the center, because "failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference"); *Wilson v. Williams*, 961 F.3d 829, 842–43 (6th Cir. 2020) (rejecting the

### b.  **Plaintiff's Withdrawals**

At one point, Plaintiff requested medication to prevent detox-related symptoms.  *See id.* at 19.  Plaintiff was denied treatment, even after Defendants learned Plaintiff was having "withdrawal symptoms," and he was directed to see a doctor.  *Id.* at 19.  In a later appointment, however, Defendant Dr. Brucelle, who "acknowledged [Plaintiff's] distress and detox symptoms," denied Plaintiff medication and noted that detoxification was the "best thing" for him.  *Id.* at 20.  According to Plaintiff, Dr. Brucelle added, "it is all in your head" and "suboxone is just poison." *Id.*  After, Plaintiff continued to experience withdrawal symptoms.  *See id.*  He claims he eventually joined a program for medication assistance (the "M.A.P.S." program) but was again denied medicine for "non-medical reasons."  *Id.* at 21.  Specifically, he says Defendant Dr. Ronald Waitts "acknowledged [his] poor condition" but "assured [him he] wouldn't receive any form of medication until [he] was transported to the Belle Glade West Detention Center."  *Id.* (cleaned up).  Plaintiff pleaded for an "individualized assessment considering [his] past withdrawals," but he did not receive medication until three months later, during which time he experienced more withdrawals.  *Id.*

At the outset, Plaintiff has presented an objectively serious medical need.  *See, e.g.*, *Johnson v. Dixon*, No. 23-CV-23021, 2023 WL 6481252, at *4 (S.D. Fla. Oct. 5, 2023) (recognizing withdrawals from opioid use disorder "can qualify as a serious medical need" (emphasis omitted)).

Moving on, the difference between Plaintiff's claims against Dr. Brucelle and Dr. Waitts is clear: Dr. Brucelle denied Plaintiff treatment upon his medical judgment, whereas Dr. Waitts's justification for denying care was a non-medical one.  ""[A] simple difference in medical opinion

---

contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir. 2016) (quoting *Harris*, 941 F.2d at 1505). And an allegation that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment[.]" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Even if Dr. Brucelle was wrong, the Court cannot ignore Plaintiff's own admission that Dr. Brucelle denied him suboxone while insisting that the medication would be harmful, *and* that Plaintiff was better served detoxifying naturally and would "be fine in a week or two."[7] Compl. at 20. Plaintiff's descriptions fail to show Dr. Brucelle's criminal recklessness—meaning, his own subjective and actual awareness that *his own conduct would cause* a substantial risk of serious harm. *See Wade*, 106 F.4th at 1262. Plaintiff's claim against Dr. Brucelle is thus **DISMISSED** *without prejudice*.

Conversely, the denial of necessary medical treatment for non-medical reasons can result in deliberate indifference. *See Harris v. Coweta Cty.*, 21 F.3d 388, 394 (11th Cir. 1994). At least for now, Plaintiff has shown Dr. Waitts did exactly that. While at all times subjectively aware of Plaintiff's need for medical attention and being positioned to help him, Dr. Waitts offered no other reason for denying him care except for Plaintiff's eventual transfer. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266–67 (11th Cir. 2020) ("It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate

---

[7] Further, Plaintiff has not sufficiently alleged how his condition—while meeting with Dr. Brucelle, who Plaintiff says "knew nothing of [his] withdrawals"—was so obviously perilous as to support an inference of Dr. Brucelle's deliberate indifference. *See Wade*, 106 F.4th at 1263 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (quoting *Farmer*, 511 U.S. at 842)).

indifference'—anti-medicine, if you will."). Since Plaintiff's allegation against Dr. Waitts *could* rise to the level of deliberate indifference, this claim shall **PROCEED** to service.

### 3.   *Claims against Deputies Ramerez, Muntean, and Turner*

Lastly, Plaintiff alleges that Defendants Ramerez, Muntean, and Turner were deliberately indifferent to his safety "by continually exposing [his] sensitive medical information and . . . using that information to give violent inmates an opportunity to extort, assault, and harass [Plaintiff]" and other inmates. Compl. at 12. Deputies Muntean and Turner "would abuse their power by humiliating [Plaintiff's] condition." *Id.*

As for Defendant Ramerez, Plaintiff's claims of retaliation bleed into his Cruel and Unusual Punishment claim. He says Ramerez had a "plan to punish [Plaintiff]" whereby he influenced gang members to physically abuse Plaintiff numerous times by exposing Plaintiff's drug use to them. *See id.* at 13. In acknowledgment, Ramerez once assured Plaintiff, "this gonna keep happening to your snitch drug addict ass." *Id.* at 14. At one point, Ramerez physically destroyed Plaintiff's property "with malice" and "with no justification." *Id.* at 16. After Ramerez "planted a shank on [his] inmate bunk," Plaintiff was placed in solitary confinement with one of his former attackers from whom Plaintiff was "clearly labeled" to be kept separate. *Id.*

As a threshold issue, verbal harassment or abuse alone does not rise to the level of Cruel and Unusual Punishment. *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008). This alone is fatal to Plaintiff's claims against all three Defendants pertaining to any verbal harassment or threats— which include *all* his claims against Defendants Muntean and Turner. Accordingly, Plaintiff's Cruel and Unusual Punishment claims against Defendants Muntean and Turner are **DISMISSED** *without prejudice*.

But Plaintiff's claims against Ramerez warrant closer consideration. The U.S. Constitution requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. It has been well established since *Farmer* that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. "[G]ratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objectiv[e]." *Id.* (cleaned up). While "isolated attacks by one prisoner or another may not constitute cruel and unusual punishment," an "excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) ("[C]onfinement in a prison where violence and terror reign is actionable."). However, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to . . . scrutiny." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Although Plaintiff presents a close call, his allegations raise various concerns in the deliberate-indifference context. To preface, a failure-to-protect claim is not easily discernible from Plaintiff's allegations; Plaintiff emphasizes harassment over neglect, averring that Defendants "were deliberately indifferent to [his] safety by continually *exposing* sensitive medical information and also using that information to give violent inmates an opportunity to extort, assault and harass [Plaintiff] and other . . . inmates." Compl. at 12 (emphasis added). Liberally construing the Complaint as alleging Ramerez's failure to protect him constitutes deliberate indifference, Plaintiff struggles to identify an objectively serious risk of harm. Specifically, he alleges that, upon Ramerez's influence, the same gang member physically abused and threatened Plaintiff at isolated times, but he doesn't present a story of perpetual inmate-on-inmate violence that would clearly manifest a substantial risk of serious harm.

And even if the threats from one gang member could be perceived as an objectively serious risk, Plaintiff does not show how Ramerez consciously disregarded that risk. Plaintiff is required

to show Ramerez "possessed both knowledge of the danger *and the means to cure it*" to prove deliberate indifference. *Averhart v. Warden*, 590 F. App'x 873, 875 (11th Cir. 2014) (emphasis added); *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). To be sure, his pleadings reflect Ramerez was subjectively aware of—and even vocally endorsed—Plaintiff's encounters with gang members. But Plaintiff does not allege that Ramerez had the *means* to prevent harm and that his failure to do so *caused* him injuries—which would satisfy *Wade*'s requirement that a defendant is actually, subjectively aware that his *own* conduct caused a substantial risk of serious injury to Plaintiff.[8] *See Wade*, 106 F.4th at 1262. For this reason, for instance, Ramerez wouldn't be liable for Plaintiff's placement in solitary confinement with the wrong inmate because Plaintiff fails to allege Ramerez *knew* of their required separation or had the means to prevent it.

---

[8] In his concurrence, Judge Adalberto J. Jordan spoke of the relationship between past precedent and the Circuit's recent decision in *Wade*:

> My suggestion, for whatever it might be worth, is that courts and attorneys look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in *Farmer*. If they are consistent, then they should continue to be cited as binding precedent. If they are not, then they probably have been abrogated to at least some degree by today's decision.

*Wade*, 106 F.4th at 1265 (Jordan, J., concurring).

The Court finds that requiring Plaintiff to establish Ramerez's means to protect him from inmate abuse is consistent with *Farmer*. That fact would seal the link between Plaintiff's alleged harm and Ramerez's own conduct. *See Borden v. United States*, 593 U.S. 420, 427 (2021) (Kagan, J.) ("A person acts recklessly, in the most common formulation, when he consciously disregards a substantial and unjustifiable risk *attached to his conduct*, in 'gross deviation' from accepted standards." (emphasis added; cleaned up)). Otherwise, the Court is left with Plaintiff's implications that his inmate attacks "stemm[ed] directly from Ramerez's deception [and] plan to punish [him]," from which the Court would need to infer that Ramerez *consciously* refused to prevent inmates from attacking Plaintiff. Compl. at 13 (cleaned up). The Court cannot afford Plaintiff this inference; as the Court later explains, all facts circumstantial to Ramerez's "plan" align more with independent inmate conduct, and it is otherwise not obvious from the allegations that Ramerez's inaction would cause a risk to Plaintiff. *See Wade*, 106 F.4th at 1263 (Jordan, J., concurring) ("Specifically, where the *consequences of an action are commonly known*, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about." (quotation marks omitted; quoting *Regalado Cuellar v. United States*, 553 U.S. 550, 567 (2008))).

Ramerez's allegedly close connections with gang members falls short of satisfying these latter requirements.  If true, Ramerez may have created a situation conducive to heightened animosity toward Plaintiff.  But whether Ramerez actually arranged for gang-member violence upon Plaintiff—which would at least demonstrate some level of control—remains uncertain.  At most, Ramerez told a gang member to "steal" from Plaintiff, but "theft or harm to *property* generally does not create a substantial risk of serious harm."  *Owens v. Funk*, 760 F. App'x 439, 443 (7th Cir. 2019) (emphasis original; citing *Farmer*, 511 U.S. at 834).  Otherwise, the whole of Plaintiff's allegations show that Ramerez spread rumors about him, which then inspired gang members to attack Plaintiff on their *own* volition.  So, while Plaintiff's claims against Ramerez are certainly cognizable under the First Amendment, he falls slightly short of pleading a deliberate indifference claim.[9]

Accordingly, Plaintiff's Cruel and Unusual Punishment claim against Defendant Ramerez is **DISMISSED** *without prejudice*.[10]

### E.  Plaintiff's Options

Plaintiff may file an amended complaint if he wishes.  *See Toenniges v. Ga. Dep't of Corr.*, 502 F. App'x 888, 889 (11th Cir. 2012) ("A plaintiff has a right to amend a complaint once as a matter of course so long as no responsive pleading has been filed.").  Plaintiff's Complaint contains a mix of valid and insufficient claims.  As the Court has explained, Plaintiff's First Amendment retaliation claims may proceed against Defendants Deputy Ramerez and Nurse Loraine Skinner, as well as his Fourteenth Amendment deliberate-indifference claim against Defendant Dr. Ronald

---

[9]  And the Court will not infer a Fourteenth Amendment excessive force claim, because Plaintiff has not so pled.

[10]  Lastly, Plaintiff has no supervisory liability claim against Defendant Sheriff Ric Bradshaw.  "In fact, aside from being named as a defendant," and conclusory statements of his supervisory liability, "Sheriff Bradshaw is not otherwise mentioned in the Complaint."  *Paulk v. Bradshaw*, No. 22-CV-80421, 2022 WL 834919, at *4 (S.D. Fla. Mar. 21, 2022).  The same goes for Defendant Sergeant Faircloth.

Waitts, but all of Plaintiff's other claims are dismissed. Therefore, Plaintiff is **ORDERED** to pick between one of the following two options:

1.      If Plaintiff wishes to proceed on his facially valid claims against Defendants Ramerez, Skinner, and Dr. Waitts, Plaintiff shall file a request that the Court direct the U.S. Marshal's Service to effect service for him. Once Plaintiff files that request, the Court will immediately direct the U.S. Marshals to serve Ramerez, Skinner, and Dr. Waitts.

2.      In the alternative, Plaintiff can file an amended complaint. *See Woldeab v. DeKalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) ("When a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the [claim] with prejudice." (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991))). If Plaintiff chooses this option, he must include all claims against all Defendants, and he can correct those claims that the Court has dismissed *without prejudice*, and Plaintiff may advance additional claims. Plaintiff must file his amended complaint on time and otherwise comply with this Court's Order.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff's Complaint, [ECF No. 1], shall **PROCEED**, but only as to the following claims: Plaintiff's First Amendment retaliation claim against Defendants Deputy Ramerez and Loraine Skinner in their <u>individual capacities</u>, and Plaintiff's deliberate indifference claim under the Fourteenth Amendment against Defendant Dr. Ronald Waitts in his <u>individual capacity</u>.

2.      Plaintiff's right-to-privacy claim under the Fourteenth Amendment is **DISMISSED** *with prejudice* for failure to state a claim. Plaintiff's other claims, including all official-capacity claims, are **DISMISSED** *without prejudice* for failure to state a claim. The Clerk is instructed to

**TERMINATE** Defendants Sergeant Faircloth, Deputy Turner, Dr. Brucelle, Deputy Muntean, Sheriff Ric Bradshaw, and the Palm Beach County Sheriff's Office.

3.      Plaintiff's Motion for Leave to Proceed *in forma pauperis*, [ECF No. 3], is **GRANTED** to the extent that Plaintiff need not prepay even a partial filing fee in this case, or prepay costs, such as for service of process. Plaintiff owes the United States a debt of $350.00 which must be paid to the Clerk of Court as funds become available. The prison having custody of Plaintiff must make payments from the prisoner's account to the Clerk each time the amount in the account exceeds $10.00 until the full filing fee of $350.00 is paid. The Clerk is **DIRECTED** to serve a copy of this Order on the Palm Beach County Sheriff's Office Inmate Trust Fund Account Department and this Court's Financial Department.

4.      Plaintiff may file an amended complaint to cure the deficiencies identified in this Order. Consistent with the purpose of FED. R. CIV. P. 8, Plaintiff is granted leave to file an amended complaint **not to exceed twenty (20) pages** in length. Moreover, the Court encourages Plaintiff to make every effort to keep his allegations within the four corners of the complaint form and to keep attached additional pages at a minimum to better adhere to the page limitations set by this Order. If applicable, the amended complaint must contain a separate paragraph as to each Defendant explaining what that Defendant did and the supporting facts to show why that person or entity is being sued.

5.      On or before **December 2, 2024**, the amended complaint must be docketed, signed under the penalty of perjury, and contain a short and plain statement of a claim for relief, a basis for federal jurisdiction, and a demand for judgment. Plaintiff is reminded that the amended complaint must cure the deficiencies identified within this Order; it must be completed on the form, include a complete list of his prior litigation history, and provide all aliases by which he has been known. The Court will only consider claims raised in the amended complaint, and the

amended complaint will be the operative document for the remainder of this action.  Plaintiff cannot reincorporate by reference prior claims.   If Plaintiff fails to file an amended complaint by the Court's deadline or otherwise comply with the Court's Order, he may not be afforded another opportunity to file an amended complaint.

5.     The amended complaint must be labeled "Amended Complaint" and must show the case number referenced above, so that it will be filed in this case.

6.     If Plaintiff chooses **not** to file an amended complaint and wishes to proceed on his claims against Defendants Ramerez, Skinner, and Dr. Waitts, Plaintiff must request that the Court direct service on his behalf.  Upon Plaintiff's request—or if Plaintiff fails to file an amended complaint by the Court's deadline of **December 2, 2024**—the Court will direct the U.S. Marshal's Service to serve said Defendants.  *See* FED. R. CIV. P. 4(c)(3).

**DONE AND ORDERED** in Miami, Florida, this 4th day of November, 2024.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:     Matthew John Lewis
        0382088
        West Detention Center
        Inmate Mail/Parcels
        P.O. Box 1450
        Belle Glade, FL 33430
        PRO SE