**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81305-RAR**

**MATTHEW JOHN LEWIS**,

     Plaintiff,

v.

**RONALD WAITTS**, *et al.*,

     Defendants.

_____/

**ORDER**

**THIS CAUSE** comes before the Court on Plaintiff Matthew John Lewis's Amended Complaint for Violation of Civil Rights under 42 U.S.C. § 1983, [ECF No. 7]. Plaintiff, a pretrial detainee, pursues various claims under federal constitutional and statutory law against ten Defendants employed by the Palm Beach County Sheriff's Office ("PBSO"). *See generally* Amended Complaint. On November 4, 2024, the Court screened Plaintiff's original Complaint and found that it "contain[ed] a mix of valid and insufficient claims." Order, [ECF No. 4], at 21. Therefore, the Court gave Plaintiff the option of either filing an amended complaint or proceeding to service of process on his facially valid claims. *See id.* at 21–22. Plaintiff chose to file this Amended Complaint which, after careful review, shall **PROCEED in part** and be **DISMISSED in part.**

**LEGAL STANDARDS**

The Court "*shall* review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A (emphasis added). The definition of a "prisoner" includes "any person incarcerated or

detained in any facility who is . . . accused of [or] convicted of . . . violations of criminal law." *Id.* § 1915A(c). In conducting its screening of a prisoner's complaint, the Court must "dismiss the complaint[] or any portion of the complaint," when it is (1) "frivolous, malicious, or fails to state a claim upon which relief may be granted[;]" or (2) "seeks monetary relief from a defendant who is immune from such relief." *Id.* § 1915A(b). Similarly, if a plaintiff wishes to proceed *in forma pauperis* rather than prepaying the filing fee, § 1915(e)(2) requires the court to "dismiss [a] case *at any time* if the court determines that . . . the action" fails for the same enumerated reasons articulated under § 1915A. *Id.* § 1915(e)(2)(B) (emphasis added).

To state a claim upon which relief may be granted, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level"—with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Under this standard, legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Moreover, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotation marks omitted).

Although the Court must hold the allegations in a *pro se* civil rights complaint "to a less stringent standard than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), *pro se* litigants are still required to comply with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Florida, *see Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) ("[A *pro se* litigant] is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."); *see also* S.D. FLA. L.R. 1.1 (explaining the Local Rules apply in all proceedings unless otherwise indicated and that the word "counsel" shall

apply to a party that is proceeding *pro se*).  The Federal Rules of Civil Procedure require, in pertinent part, that a pleading that states a claim for relief contain "a short and plain statement of the grounds for a court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought[.]"  FED. R. CIV. P. 8(a).  "A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances[,]" and "each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense."  *Id.* 10(b).

## ANALYSIS

The Court construes the Complaint as presenting nine deliberate indifference counts against Defendants Dr. Bucelle, Dr. Waitts, Deputy Ramerez, Deputy Muntean, Deputy Turner, Sheriff Bradshaw, Sergeant Faircloth, Wellpath Medical, and PBSO; two counts of First Amendment retaliation against Defendants Ramerez and Loraine Skinner; and four counts of violating the Americans with Disabilities Act ("ADA") against Defendants Bradshaw, Faircloth, Wellpath Medical, and PBSO.  After carefully screening Plaintiff's renewed allegations, the Court will once again **ALLOW** Plaintiff's two First Amendment retaliation claims against Defendants Ramerez and Skinner, as well as Plaintiff's deliberate indifference claim against Dr. Waitts, to proceed to service.  This time, the Court will *also* **ALLOW** Plaintiff's two deliberate indifference claims against Deputy Ramerez and Dr. Bucelle to proceed to service.  The Court will **DISMISS** all other claims.

### I.  Deliberate Indifference Claims

The Court will first address Plaintiff's deliberate indifference claims against Defendants Dr. Bucelle, Dr. Waitts, Deputy Ramerez, Deputy Muntean, and Deputy Turner, temporarily

setting aside Plaintiff's policy-based claims.  In the Eleventh Circuit, a plaintiff asserting an Eighth Amendment claim of deliberate indifference must satisfy two prongs.[1] First, the plaintiff must show that "the deprivation he allegedly suffered was 'objectively, sufficiently serious,'" which requires him to establish an "objectively serious medical need." *Wade v. McDade*, 106 F.4th 1251, 1255–56 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994)).  Second, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," which means that "the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff[.]" *Id.* at 1262.  But, a defendant "cannot be found liable . . . if he responded reasonably to the risk." *Id.* (cleaned up).  Aside from these two elements, a plaintiff pursuing a claim of deliberate indifference must also show a causal connection between the defendant's alleged deliberate indifference and that plaintiff's injury.  *See Harris v. Prison Health Servs.*, 706 F. App'x 945, 953 (11th Cir. 2007).

When medical care is provided, deliberate indifference generally includes "(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all[.]" *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *see also id.* ("A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference." (citation omitted)); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (holding that an official who was aware of a serious medical problem but provided medical care "so cursory as to amount to no treatment at all . . . may violate the Fourteenth Amendment").  Moreover, the denial or delay of

---

[1] Since Plaintiff is a pretrial detainee, his claims arise under the Fourteenth Amendment.  *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000) (stating that a pretrial detainee's "Cruel and Unusual Punishment claims sound properly in the Fourteenth Amendment right to due process of law rather than in the Eighth Amendment," both of which are analyzed identically).

medical treatment lacking any medical justification is deliberate indifference.  *See id.* at 704 ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." (citation omitted)); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a *prima facie* case of deliberate indifference." (listing cases)).

### A.  Dr. Bucelle

The Court will allow Plaintiff to proceed on his improved deliberate indifference claim against Dr. Bucelle.  Plaintiff alleges that Wellpath medical staff denied him withdrawal medication for his opioid use disorder ("O.U.D."), and he "was forced to go through severe withdrawals for many days" while in quarantine.  Am. Compl. at 9.  One day, Plaintiff "told [Dr.] Bucelle of [his] withdrawal symptoms and desire . . . for medication."  *Id.* (cleaned up).  Although Dr. Bucelle "acknowledged [his] poor state and agreed [he] appeared to be suffering from withdrawals and [that] suboxone would fix all [his] suffering," he refused to treat Plaintiff "due to [a] nonmedical policy."  *Id.*  (cleaned up).

Plaintiff has established an objectively serious medical need.  *See, e.g.*, *Johnson v. Dixon*, No. 23-CV-23021, 2023 WL 6481252, at *4 (S.D. Fla. Oct. 5, 2023) (recognizing withdrawals stemming from opioid use disorder "can qualify as a serious medical need" (emphasis omitted)).  Contrary to the initial Complaint, Plaintiff has now plausibly pled Dr. Bucelle's deliberate indifference—specifically, Dr. Bucelle's refusal to treat Plaintiff's serious medical need, of which Dr. Bucelle was subjectively aware, for a non-medical reason.  *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266–67 (11th Cir. 2020) ("It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of

'deliberate indifference'—anti-medicine, if you will."). Accordingly, Plaintiff's deliberate indifference claim against Dr. Bucelle shall **PROCEED** to service.

### B.  Dr. Waitts

Plaintiff may still proceed on his deliberate indifference claim against Dr. Waitts. "[J]ust like Dr. Bucelle," Plaintiff alleges that Dr. Waitts "took notice of [his] dire state of opioid withdrawal" and "officially diagnosed" him with O.U.D. Am. Compl. at 9. When Plaintiff asked when he could expect medication, Dr. Waitts explained that Plaintiff "wouldn't receive medication until [his] transport to" the facility's medication-assistance program "based on [a] non-medical policy of PBSO and Wellpath." *Id.* As before, Plaintiff has plausibly alleged that Dr. Waitts denied Plaintiff medical care for non-medical reasons, despite being subjectively aware of Plaintiff's serious condition and having the means to help him. Therefore, Plaintiff's deliberate indifference claim against Dr Waitts shall **PROCEED** to service.

### C.  Deputy Ramerez

*First*, the Court will dispose of Plaintiff's claim that Defendant "Ramerez is guilty of [a] campaign of harassment[.]" *Id.* at 13. The Court previously explained that Plaintiff's allusions to harassment fell "significantly short of the pleading standards governing any legal theory" and, in any event, they were (and still are) "duplicative of [his] claims of retaliation[,] discrimination, and other unlawful inflictions of punishment." Order at 13 (cleaned up). Therefore, Plaintiff's 'campaign of harassment' claim against Ramerez is **DISMISSED**.

*Second*, the Court *will* allow Plaintiff's revised deliberate indifference claim against Ramerez. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer*, 511 U.S. at 833 (cleaned up)). To state a claim of deliberate indifference to inmate

safety, a plaintiff must show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Id.* (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013)).  A plaintiff may demonstrate either that he "was the target of a specific threat or danger, and that [prison officials] subjectively were aware of the individualized danger, yet they failed to act to alleviate that risk," *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016), or a "generalized risk of violence" at his facility, which requires "that serious inmate-on-inmate violence was the norm or something close to it." *Marbury v. Warden*, 936 F.3d 1227, 1234–35 (11th Cir. 2019)

Having liberally construed the initial Complaint, the Court inferred that Plaintiff was "alleging Ramerez's failure to protect him[.]"  Order at 19.  Such a claim, the Court noted, was "not easily discernible," as Plaintiff had emphasized Ramerez's "harassment over neglect" in explaining how Ramerez deliberately exposed Plaintiff's sensitive medical information to influence other inmates to extort and assault him.  *Id.*  The Court explained that Plaintiff "struggle[d] to identify an objectively serious risk of harm," and that he did "not allege that Ramerez had the means to prevent harm and that his failure to do so caused him injuries."  *Id.* As a whole, the initial Complaint conveyed *not* deliberate indifference, but, rather, "that Ramerez spread rumors about [Plaintiff], which then inspired gang members to attack Plaintiff on their *own* volition."  *Id.* at 21 (emphasis original).  And the Court declined to construe an excessive force claim, as Plaintiff had not so pled.  *See id.* n.9.

Now, Plaintiff has added factual allegations that comport with a failure-to-protect theory. Plaintiff recites instances in which he faced a substantial risk of serious physical violence from other inmates, such as stabbings, broken bones, and chokeholds.  *See* Am. Compl. at 6–7.  He notified Ramerez, who repeatedly refused to protect or move him despite knowing his

individualized risk of danger from inmates who Ramerez *himself* encouraged to harm Plaintiff. *See id.* at 6 (alleging that Plaintiff "told Ramerez, '[J]ust move me,'" to which Ramerez replied, "[H]ell no, you gon' learn today" (cleaned up)); *id.* (alleging that Plaintiff "went to Ramerez and told him [he] was in fear for [his] life" and asked Ramerez, "[P]lease move me," but Ramerez said, "Be a man and standup for yourself" and that "he was not doing any paperwork" (cleaned up)); *id.* (alleging that Plaintiff "went to Ramerez to seek help," who told Plaintiff "to stop being a snitch and that he knew what happened" to him; adding that Ramerez had told inmates "not to touch [Plaintiff's] face," after which Ramerez "shouted something in Spanish to [Plaintiff's] attackers and told [him] to go away before [he] really got hurt" (cleaned up)); *id.* ("From that point on, Ramerez was deliberately indifferent to my safety."); *id.* at 7 (alleging that Plaintiff "ran . . . to tell Ramerez [he] was in real danger," and Ramerez replied, "[Y]ou know my philosophy" (cleaned up)); *id.* (alleging that Ramerez told an inmate he needed "to beat [Plaintiff's] ass and take his shit," after which the inmate's gangbrother "pushed [Plaintiff] against the wall and . . . choked [him]" while "Ramerez was watching[,] stood up[,] laughed[,] and pulled the computer screen up and sat back down" (cleaned up)); *id.* ("Ramerez . . . told me, '[I]f you move bunks or leave this dorm, [I'll] call medical and have you taken off suboxone 'cause you selling it.'"). Among these detailed allegations, Plaintiff has plausibly alleged that Ramerez was deliberately indifferent to his safety by refusing to protect Plaintiff, *and* it's also plausible that such refusal caused Plaintiff's injuries. *See, e.g.*, *id.* at 6 (alleging that Plaintiff was "suddenly knocked unconscious" and "kick[ed] . . . in the chest, stomach, and legs" about two hours after Plaintiff asked Ramerez to move him from inmates).

Thus, Plaintiff's deliberate indifference claim against Ramerez shall **PROCEED** to service.

### D.  Deputy Muntean and Deputy Turner

To the extent Plaintiff still maintains deliberate indifference claims against Defendants Muntean and Turner, these claims fail.  Plaintiff merely alleges that Defendants joined Deputy Ramerez in spreading information regarding Plaintiff's medical condition and making Plaintiff "a major target of abuse, extortion, and physical[] attack[s]."  *Id.* at 6–7.  Not only are these bare-bones allegations, but Plaintiff cannot overcome the obstacle that "verbal harassment or abuse alone does not rise to the level of Cruel and Unusual Punishment."  Order at 18 (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008)).  Therefore, Plaintiff's claims against Muntean and Turner are **DISMISSED**.

### II.  First Amendment Retaliation Claims

Next, the Court screens Plaintiff's speech retaliation claims against Defendants Ramerez and Skinner.  "An inmate raises a First Amendment claim of retaliation if he shows that a prison official disciplined him for filing a grievance or lawsuit concerning the conditions of his imprisonment."  *Logan v. Hall*, 604 F. App'x 838, 840 (11th Cir. 2015). To state a plausible retaliation claim, a plaintiff must meet three elements: (1) he engaged in constitutionally protected speech or conduct, (2) the defendant's retaliatory actions adversely affected him such that the defendant's alleged conduct "would likely deter a person of ordinary firmness from engaging in such speech," and (3) a causal relationship exists between the defendant's retaliatory conduct and his protected speech.  *Hoever v. Hampton*, No. 14-cv-273, 2016 WL 3647596, at *3–4 (N.D. Fla. May 19, 2016), *report and recommendation adopted*, 2016 WL 3647151 (N.D. Fla. June 28, 2016); *see also Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

Plaintiff has once again stated a First Amendment retaliation claim against both Ramerez and Skinner.  He alleges that, after Ramerez learned of Plaintiff's grievance, Ramerez destroyed Plaintiff's property and "had [him] assaulted and attacked by inmates[.]"  Am. Compl. at 10.  At one point, Ramerez told Plaintiff to "keep writing grievances and you won't make it home."  *Id.* Similarly, after Plaintiff filed grievances alerting officials to discrimination by Wellpath nurses, Skinner threatened Plaintiff, referring to him as a "grievance writing snitching ass," and told Plaintiff, "I'll have Ortiz beat your ass again," and, "I have plenty of admirers I can have beat your ass in your dorm."  *Id.*  Plaintiff avers that he "was . . . genuinely worried about putting in specific names after a few threats of deception about [his] medication or a planted knife, [as well as] acts of violence from reliable violent histories."  *Id.*  (cleaned up).

As before, the Court finds that Plaintiff was adversely and directly affected by Ramerez and Skinner's behavior, since Plaintiff was afraid to report certain names following their threats of violence. Plaintiff also satisfies the causal connection requirement, as Ramerez and Skinner's comments evince that Plaintiff's grievances were grounds for their retaliatory conduct.  *See Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) ("The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because [Plaintiff] complained of some of the conditions of his confinement." (citation omitted)). Thus, Plaintiff's First Amendment claims against Defendants Ramerez and Skinner shall **PROCEED** to service.

### III.  Policy-Based Claims

The Court will now address Plaintiff's remaining claims against Wellpath, Sheriff Bradshaw, and Sergeant Faircloth, as well as Plaintiff's official capacity claims.  After careful analysis, and for the reasons below, the remainder of Plaintiff's claims are **DISMISSED.**

### A. Municipal and Supervisory Liability

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]"  *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 n.55 (1978).  "Such suits against municipal officers are therefore, in actuality, suits directly against the [municipality] that the officer represents."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citing cases).  Ultimately, "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."  *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

"A municipality may be held liable under [42 U.S.C.] § 1983 if the plaintiff shows that a 'custom' or 'policy' of the municipality was the 'moving force' behind the constitutional deprivation."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (quoting *Monell*, 436 U.S. at 690–94).  Moreover, to state a § 1983 claim against a private entity performing public functions, there must *also* be a policy or custom that caused the constitutional deprivation.  *See Buckner v. Toro*, 116 F.3d 450, 452–53 (11th Cir. 1997).  "A plaintiff . . . has two methods . . . to establish a . . . policy: identify either (1) an officially promulgated . . . policy or (2) an unofficial custom or practice of the [entity] shown through the repeated acts of a final policymaker[.]"  *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329–30 (11th Cir. 2003).  For those pursuing the second option, "[a] pattern of similar constitutional violations ... is 'ordinarily necessary,'" *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)), because a single violation is not so pervasive as to amount to a custom, *see Grech*, 335 F.3d at 1330.

Similarly, a sheriff's supervisory liability under § 1983 can occur in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to

correct the alleged deprivation, and he fails to do so[,]" (2) the supervisor has a "custom or policy" which "results in deliberate indifference to [the plaintiff's] constitutional rights," or (3) the supervisor failed "to adequately train [his] officers"—which is a de facto policy that "giv[es] rise to governmental liability." *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (cleaned up).  Like a municipality, a sheriff is not liable for the unconstitutional acts of his or her subordinates on the basis of *respondeat superior* or vicarious liability.  *See Cottone v. Jenne*, 326 F.3d 1352, 1362 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

### B.  Plaintiff's Claims

The Court addresses two threshold issues.  *First*, Plaintiff has sued all Defendants in their individual and official capacities, *and* he sues PBSO separately.  Plaintiff's PBSO claim is thus duplicative of his official capacity claims, but under Florida law, PBSO is not a "legal entit[y] subject to suit" under § 1983.  *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992).  Nevertheless, since Plaintiff has failed to establish an unconstitutional policy or custom for the reasons explained below, the Court will address the merits of Plaintiff's claims.  *Second*, Sheriff Bradshaw "is the only official who oversees 'the daily operation of the jails and the supervision of inmates'" and, therefore, is the only party who's responsible "for the Jail's allegedly unconstitutional policies or customs."  *Burgess v. Palm Beach Cnty.*, No. 23-CV-81265, 2023 WL 7410056, at *2 (S.D. Fla. Nov. 9, 2023).   The Court will therefore **DISMISS** Defendant Faircloth, who Plaintiff hardly names in the Amended Complaint and otherwise does not establish as the final policymaker for PBSO for supervisory liability purposes.

Moving on, Plaintiff alleges the existence of *two* unconstitutional policies, gleaned from a generous reading of the Amended Complaint: (1) PBSO, Wellpath, and Bradshaw upheld a

policy of retaliating against inmates who file grievances; and (2) PBSO and Wellpath were deliberately indifferent to inmates' health by maintaining harmful conditions during the COVID-19 pandemic and enforcing a policy of denying inmates medication for COVID-19.[2]

### 1. First Amendment Retaliation

Plaintiff alleges that Bradshaw, Wellpath, and PBSO enforced a policy of retaliating against inmates who filed grievances and reports. The extent of Plaintiff's allegations are as follows: He claims he "was thrown into systematic discrimination against O.U.D. inmates" and that it was "common custom" for them "to be preyed on by deputies and nurses" who "berate[d] inmates for grievances." Am. Compl. at 10. Plaintiff says that "inmates knew better than to specifically name anyone unless they wanted their direct attention," so for this reason, "[g]rievances were never followed up on and were never taken serious[ly] on these issues[.]" *Id.* Plaintiff adds that Defendant "Bradshaw knew of many incidents and internal affairs investigations[,] but nobody was ever reprimanded[;] therefore[,] there was no fear of escalation to abuse power[.]" *Id.* (cleaned up).

Plaintiff's claims against all three Defendants fall short because he fails to provide any *specific*, widespread patterns of retaliation aside from his own experiences. Rather, Plaintiff

---

[2] Even though Plaintiff sues all Defendants in their official capacities, the Court does not construe a *Monell* claim against PBSO and Wellpath related to a policy of denying inmates opioid withdrawal medication. Plaintiff indicates that his opioid-themed medical deliberate indifference claims are linked only to Dr. Waitts and Dr. Bucelle. *See* Am. Compl. at 3. And Plaintiff clarifies the scope of PBSO and Wellpath's liabilities by stating, "Wellpath is being sued for the customs of discrimination to [inmates with opioid use disorder], [its] failure to investigate said discrimination and do anything to fix it as well as retaliation from their nurses. . . . PBSO is liable because [of] the widespread disorder it has failed to investigate and fix but chose to ignore with 'Don't ask, won't tell' philosophy that led PBSO and Wellpath to feel no end to abuse power." *Id.* at 14.

As a separate matter, it is hard to ignore that Plaintiff's COVID-19-themed deliberate indifference claim lacks one extremely important detail—a defendant. *See* Am. Compl. at 13–14. Nevertheless, the Court liberally construes (as it did in its original screening Order) that Plaintiff is alleging that PBSO and Wellpath have a policy of denying inmates COVID-19 medication and have failed to correct harmful conditions. The Court will not interpret Plaintiff's claim as brought against any individual nurses, as he only names "Nurse Jane Doe" who is not a Defendant in this case. *Id.* at 13.

relies on generalized assertions that "grievances were never followed up on" and that "inmates knew" of a common custom of retaliation. *Id.*; *see Craig*, 643 F.3d at 1311–12 (holding that plaintiff failed to establish an unconstitutional policy sufficient for municipal liability when he relied only on his own experience). Without additional examples, Plaintiff's suggestion that "Bradshaw knew of many incidents" and that "Wellpath and PBSO [had a] custom" to allow retaliation are nothing more than conclusory allegations.  Am. Compl. at 10; *see Gurrera v. Palm Beach Cnty. Sheriff's Off.*, 657 F. App'x 886, 893 (11th Cir. 2016) (holding that plaintiff failed to state a claim with "conclusory allegations . . . that there was 'a pattern . . . of obtaining coerced and false statements,' there was 'a pattern and practice of engaging in false arrests, imprisonment, [and] false prosecution,' and the Sheriff's Office ha[d] 'failed to properly correct the obvious deficiencies which caused the injuries to [plaintiff] and others'" (cleaned up)).

Thus, Plaintiff's retaliation claims against Defendants Bradshaw, Wellpath, and PBSO are **DISMISSED**.

### 2. *Deliberate Indifference*

Once again, Plaintiff's deliberate indifference claim against Wellpath and PBSO fails.  In his initial Complaint, Plaintiff alleged that he sought Tylenol from a Wellpath nurse but was denied because he "had not seen the doctor," which he said was "impossible."  Complaint, [ECF No. 1], at 18.  Further, Plaintiff hardly elaborated on his COVID-19 symptoms.  *See id.*  The Court determined that Plaintiff neither described a serious medical need nor specified how any medical staff member was "actually, subjectively aware that his own conduct caused a substantial risk of serious harm" to Plaintiff.  Order at 15 (quoting *Wade*, 106 F.4th at 1262).  Without a constitutional violation, the Court said it "need not analyze whether Plaintiff meets *Monell*'s requirements to sue PBSO and Wellpath."  *Id.*

In the Amended Complaint, Plaintiff describes that he had "brain numbing migraines," a "sore throat," and felt like his "head was on fire." Am. Compl. at 13. A nurse denied him Tylenol twice, despite seeing "[Plaintiff]'s poor state of sickness." *Id.* Plaintiff claims that, for the three days that followed until he received medication, he "honestly thought [he] could die." *Id.* Plaintiff claims he submitted grievances on this issue but "never got any response." *Id.* He also alleges that another nurse denied him pain medication for his COVID-19 symptoms after noticing Plaintiff was "in serious pain," and he separately describes how failed sterilization and quarantine measures at his facility led to his infection on several occasions. *Id.*

Whether Plaintiff's cold symptoms amounted to a serious medical need is up for debate. *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) ("[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994))). Assuming Plaintiff had a serious medical need and that Wellpath nurses knowingly disregarded that need for non-medical reasons, Plaintiff's allegations boil down to merely two instances when nurses denied him treatment, which pale in comparison to the kind of widespread misconduct needed to plausibly allege an unconstitutional policy or custom. *See Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (holding that two instances of sexual harassment were insufficient to demonstrate a pattern of widespread abuse); *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016) ("One or two incidents of abuse is generally insufficient to indicate a pattern."); *Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018) (stating that a complaint must include "specific facts of numerous incidents demonstrating a widespread practice").

To the extent Plaintiff again alleges harmful conditions, he fails a second time under the Court's previous reasoning.  *See* Order at 15 n.6.  As before, the Amended Complaint reflects that Plaintiff's facility at least *had* a quarantine policy whereby dorms were separated.  Even if those preventative measures failed, "deliberate indifference is not a constitutionalized version of common-law negligence."  *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020); *see also id.* (holding facility was not deliberately indifferent in preventing spread of COVID-19 where social distancing was impossible to achieve due to center population because "failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference"); *Wilson v. Williams*, 961 F.3d 829, 842–43 (6th Cir. 2020) (rejecting the claim that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions [were] ineffective at preventing the spread of COVID-19" (cleaned up)).  Therefore, Plaintiff's deliberate-indifference claims against PBSO and Wellpath are **DISMISSED**.

## IV.  Americans with Disabilities Act Claims

Once again, Plaintiff alleges that Wellpath, Bradshaw, Faircloth, and PBSO violated Title II of the Americans with Disabilities Act ("ADA") by discriminating against him on the basis of his medical condition.  *See, e.g.*, Am. Compl. at 11 ("It is a common custom that Rick Bradshaw never investigated and made any attempts at fixing issues on discrimination from PBSO staff or Wellpath."); *id.* at 12 ("Bradshaw is liable . . . as well as Sgt. Faircloth [sic].").

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute creates a private cause of action for monetary damages against a public entity that discriminates against a qualified individual.  *See id.* § 12133; *see also*

*United States v. Georgia*, 546 U.S. 151, 154 (2006).  However, individuals and private entities are not liable under Title II of the ADA.  *See Edison v. Douberly*, 604 F.3d 1307, 1308 (11th Cir. 2010).

To state a claim under Title II, a plaintiff must allege the following three elements: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."  *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023) (cleaned up; quoting *J.S., III ex rel. J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017)).

"An ADA claimant may proceed on theories of intentional discrimination, disparate treatment, or failure to reasonably accommodate the plaintiff's disability."  *Norman v. Jones*, No. 19-CV-4, 2019 WL 5699097, at \*4 (N.D. Fla. Oct. 11, 2019), *report and recommendation adopted*, 2019 WL 5697184 (N.D. Fla. Nov. 4, 2019) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).  The "disparate treatment" theory—Plaintiff's chosen theory, *see* Am. Compl. at 11—"prohibits intentional acts of discrimination by covered entities." *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995).  Such a plaintiff must show that he was treated differently than non-disabled persons by reason of his or her disability.  *See Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1328 (S.D. Fla. Nov. 3, 2020).

An ADA plaintiff suing a municipal entity "must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf' had 'actual knowledge of discrimination in the entity's programs and

failed adequately to respond.'" *Friedson v. Shoar*, 479 F. Supp. 3d 1255, 1264 (M.D. Fla. 2020) (quoting *Silberman v. Miami-Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019)).  And, if that plaintiff pursues damages, he must also prove that the entity engaged in *intentional* discrimination, meaning the entity "knew that harm to a federally protected right was substantially likely and failed to act." *Id.* at 1263.

As the Court has previously explained, Bradshaw, Faircloth, and Wellpath are not public entities; thus, they are not subject to suit under Title II.  *See Brennan v. Thomas*, 780 F. App'x 813, 823 (11th Cir. 2019).  As to Plaintiff's claim against the PBSO, Plaintiff is once again requesting monetary damages, so he must allege intentional discrimination.[3]  *See* Am. Compl. at 8 ("I'm seeking $500,000.00 in actual damages and $10,000 in punitive damages.").  Plaintiff's previous attempt at his ADA claim against the PBSO was inadequate because he "fail[ed] to address whether PBSO had any actual knowledge of its employees' discriminatory comments or how PBSO failed to respond to them," and Plaintiff "cannot simply impute such knowledge merely through factually unsupported grievances he may have filed."  Order at 9.

Here, Plaintiff provides some specific examples meant to prove that "PBSO . . . knew [or] should have known about rampant discrimination"—such as incidents of "excessive use of force," discrimination, extortion, violence, and exposure of privacy, which were reported to and ignored by PBSO.  Am. Compl. at 12.  He also claims that "[i]t was common for O.U.D. inmates to put in sick calls to be seen by mental health about their addiction to be never followed up on and to be laughed at by [Defendant] Skinner who didn't take it[.]"  *Id.* at 12.

---

[3] Although PBSO is not a legal entity subject to suit in a § 1983 claim, "[a] county law enforcement department is a public entity and thus a proper party to a claim for disability-based discrimination brought under Title II of the ADA."  *D.L. by & through S.L. v. Hernando Cnty. Sheriff's Off.*, 620 F. Supp. 3d 1182, 1192 (M.D. Fla. 2022) (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084 (11th Cir. 2007) (explaining that the plaintiff "could still attempt to show an ADA claim under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability'" (quotation omitted))).

But these averments present a new problem: Plaintiff never explains how drug addiction was PBSO's motivation behind ignoring or endorsing any of these incidents of discrimination. *See Bircoll*, 480 F.3d at 1081 ("[A] disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability." (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998))).   At best, Plaintiff's allegations highlight PBSO's futile grievance system and its failure to respond to independent actions by jail staff that may have affected disabled inmates.   But Plaintiff falls short of showing that he "has actually been treated differently than similarly-situated non-handicapped people" as required to prevail on a theory of disparate treatment or intentional discrimination.  *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 767 (11th Cir. 2020).

True, Plaintiff comes somewhere close when he describes, for instance, how Defendant Skinner treated him differently from another similarly situated inmate.  *See, e.g.*, Am. Compl. at 11 ("One day [J]ones dropped a pill from Skinner [and] she nicely threw it away, no questions[,] and handed Jones a new one. . . . Skinner once dropped my film on the ground and when I hesitated to take it, she told me I was a 'Junkie whose done worse.'" (cleaned up)).  But PBSO— and *not* Skinner—is the proper defendant in Plaintiff's ADA claim.  Assuming this were enough to make a *prima facie* case of disparate treatment, Plaintiff must plausibly allege PBSO's actual knowledge of discrimination in its programs and its deliberate indifference toward that discrimination.

Plaintiff fails to do that.  He claims that he was "denied any mental health treatment by Wellpath" which he "made [] clear to PBSO," but "nothing was done."  *Id.*  Plaintiff "wrote multiple grievances about these issues and so did many O.U.D. inmates," and at various times, Plaintiff broadly refers to "incident reports" that were "never investigated," as well as inmates

who filed grievances and "never got a response." *Id.* He also avers that Defendant Bradshaw has a "[d]on't ask, don't tell" policy that makes "deputies and nurses alike feel [they can] continue to abuse their authority[.]" *Id.* Again, while Plaintiff has elucidated a futile grievance process at his detention facility, he provides no specific examples of discrimination in PBSO's programs other than his own experiences. As such, Plaintiff hasn't established that PBSO turned a blind eye to "substantially likely" discrimination to justify his request for monetary damages. *Friedson*, 479 F. Supp. 3d at 1264. Plaintiff thus fails to state an ADA claim against the PBSO.

*   *   *

Since the Court has already provided Plaintiff with the opportunity to amend his Complaint, dismissal with prejudice of his insufficient claims is appropriate since any further "amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001); *see also Kincaid v. Lockwood*, No. 20-10062-Civ, 2021 WL 274811, at *1 (S.D. Fla. Jan. 27, 2021) (dismissing a § 1983 complaint with prejudice after plaintiff filed an Amended Complaint which "failed to state a claim" after previously being granted leave to amend to cure that deficiency). Accordingly, Plaintiff shall proceed to service of process on his plausible claims, those of which the Court has identified herein—but Plaintiff is not permitted to file a second amended complaint to re-plead his other claims.

**<u>CONCLUSION</u>**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff's Amended Complaint, [ECF No. 7], shall **PROCEED** on his First Amendment retaliation claims against Defendants Deputy Ramerez and Loraine Skinner in their individual capacities, and his Fourteenth Amendment deliberate indifference claims against

Defendants Dr. Ronald Waitts, Dr. Bucelle, and Deputy Ramerez in their individual capacities. The Clerk shall **REINSTATE** Defendant Dr. Bucelle as a Defendant in this case.

       2.      All of Plaintiff's other claims in the Amended Complaint are **DISMISSED** for failure to state a claim under 28 U.S.C. § 1915A.  Defendants Sheriff Ric Bradshaw, Sergeant Faircloth, Deputy Muntean, Deputy Turner, Wellpath Medical, and the Palm Beach Sheriff's Office remain **TERMINATED**.

       3.      Since Plaintiff is proceeding *in forma pauperis*, the Court will direct the U.S. Marshal's Service by separate order to effect service of process on Defendants Deputy Ramerez, Loraine Skinner, Dr. Ronald Waitts, and Dr. Bucelle.  *See* Fed. R. Civ. P. 4(c)(3).

       4.      This case shall be **CLOSED** for **administrative purposes only**.  Any Defendant may move to reopen this case once all the Defendants have been served.

       **DONE AND ORDERED** in Miami, Florida, this 19th day of December, 2024.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:    Matthew John Lewis
       0382088
       West Detention Center
       Inmate Mail/Parcels
       P.O. Box 1450
       Belle Glade, FL 33430
       PRO SE